MAY-24-2013 FRI 03:31 PM                    FAX NO.

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

**Christopher A. Parlo**
Partner
212.309.6062
cparlo@morganlewis.com



```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/28/13
```

May 24, 2013

**VIA FACSIMILE**

The Honorable Robert P. Patterson
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   William Pierce v. ABC Carpet Co., et al. 04-CIV-1218

Dear Judge Patterson:

We represent ABC Carpet Co., Inc. ("ABC"), Jerome Weinrib and Paul Chapman ("Defendants") in the above-referenced matter.  We write in response to Plaintiff's May 21, 2013 letter and to address the issue of Plaintiff's admitted inability to prove any damages -- a necessary element of his claim against Defendants.  Specifically, Plaintiff can proffer no affirmative evidence of the number of hours he purportedly worked because he failed to keep any records and cannot recall how much time he spent on any job.  Therefore, any testimony he attempts to offer at trial about his work hours would be speculative, self-serving, and suspect. Accordingly, for the reasons detailed below, the cases cited in Plaintiff's letter concerning "recollection testimony" are completely inapplicable.

Plaintiff attempts to avoid the fact that he failed to keep and/or destroyed all evidence of his work by contending that Defendants somehow violated a legal duty to maintain records of his work hours.  Defendants, however, had no such duty with respect to Plaintiff as he was not an employee.  As confirmed repeatedly through his tax returns and other evidence, Plaintiff was an independent contractor.  If Plaintiff wanted records of the work he did and how long it took it was his responsibility to keep those records.[1]  This is particularly true as Plaintiff was required to

---

[1]  The record evidence in this case establishes that Plaintiff admittedly considered and treated himself at all relevant times as an independent contractor, including for tax and other purposes. For example, he admits that he:  (1) hired workers (Pl. Dep. at 99, 128-129); (2) paid wages to his employees and took a corresponding tax deduction (Pl. Dep. at pp. 102-105); (3) selected and purchased his own tools (Pl. Dep. at p. 70-71); (4) did not receive any employee benefits (Pl. Dep. at p. 23); (5) received no training from ABC (Pl. Dep. at p. 46); and (6) received no

The Honorable Robert P. Patterson
May 24, 2013
Page 2



**Morgan Lewis**
COUNSELORS AT LAW

keep records for his business for the three individuals who the State of New York found that he employed to assist with his carpet installation work (and for whom he took tens of thousands of dollars worth of deductions on his income tax returns for the wages he paid them). He was responsible for maintaining records for each of his employees. The glaring lack of any such records makes clear that Plaintiff is the one who failed in his legal duty, not Defendants. As a result of Plaintiff's failure to keep such records he cannot point to a single document, from his business or otherwise, that would support his claim for damages or allow for the calculation of any such alleged damages (which is, perhaps, the reason for his continued refusal to provide a specific calculation of damages in violation of the Federal Rules of Civil Procedure).[2]

Because he failed to retain and/or destroyed all evidence of the work he did, Plaintiff's letter states that case law allows him to put in evidence of the amount of work he allegedly performed "through estimates based on his own recollection." The fatal flaw with Plaintiff's argument, however, is that he admitted that he has no recollection of how much time it took him to do any job and that he could not retroactively reconstruct that time. In his sworn deposition testimony, Plaintiff admitted that he has **"no way of knowing how many hours that [he] worked."** Pl. Dep. at 153:6-11. When asked how many hours he worked in a particular week, he responded, **"You can't possibly expect me to tell you on this particular date how many hours I worked at that date. Do you know anybody who can do that besides Superman?"** Pl. Dep. at p. 161:11-21. He could not remember the days he worked, if he took days off, or if he did or did not work more than 40 hours in any week in which he did take a day off or accepted or had no jobs. See, e.g., Pl. Dep. at 56:22-25; 88:13-25; 89:13-25; 154:12-18. It is completely implausible then, after testifying so adamantly that it would be impossible for him to recollect such information, that Plaintiff could now remember how many hours he worked. Thus, Plaintiff's testimony makes the cases he cited inapplicable.

As is glaringly evident, any testimony that Plaintiff would now offer at trial as to his recollection of when he left for work each morning and returned home at night, over a decade ago, would be highly suspect and in direct contradiction with his prior sworn testimony. Accordingly, the Court does not have to, and should not, allow or give any credit to such specious testimony. Plaintiff must first establish that he is entitled to a rebuttable presumption of his hours worked by presenting evidence, such as sworn affidavits, detailing the time spent on certain projects. See Ting Yao Lin v. Hayashi Ya II, Inc., No. 08–CV–6071, 2009 WL 289653, at *3 (S.D.N.Y. Jan. 30, 2009) (finding plaintiffs' initial burden was satisfied by affidavits based on the plaintiffs'

---

supervision from anyone at ABC. Pl. Dep. at p. 48-49. A copy of the pages from Plaintiff's deposition which are cited herein is attached at Tab A.

[2] Plaintiff also now faults Defendant for not initially finding its copy of the invoices Plaintiff submitted for 1999. However, this completely glosses over the point that Plaintiff created these and all of his other invoices. Apparently, however, Plaintiff failed to keep and/or destroyed every invoice he created. So he literally kept absolutely no records of the amount of time he worked yet now faults Defendant for not being able to initially find one subset of his invoices.

The Honorable Robert P. Patterson
May 24, 2013
Page 3



**Morgan Lewis**
COUNSELORS AT LAW

recollection describing the time spent performing various tasks for which they did not receive
overtime compensation). But Plaintiff in this case has made clear that he has no recollection of
his hours worked. As a result, he has presented absolutely no evidence for Defendants to rebut.
See Pineda v. Masonry Constr., Inc., 831 F. Supp. 2d 666 (S.D.N.Y. 2011) ("Because Plaintiffs
have failed to come forward with sufficient evidence of the hours worked and wages earned by
M. Ramos and Mendes, their claims for unpaid overtime must be dismissed"); Hosking v. New
World Mortg., Inc., 2012 U.S. Dist. LEXIS 184192 (E.D.N.Y. Dec. 20, 2012) ("The court notes
that absent additional evidence, the plaintiffs' claim that Hester worked 70 hours a week, 52
weeks a year, for two years straight, simply strains credibility").

In fact, even the case law Plaintiff cites in his May 21, 2013 letter holds that a plaintiff is only
entitled to a rebuttable presumption "if he produces sufficient evidence to show the amount and
extent of that work as a matter of just and reasonable inference." (emphasis added) Plaintiff's
desire to now present evidence from his recollection would be neither "sufficient" nor "just and
reasonable" in light of his prior admission that he has absolutely no recollection of how long it
took him to do any job.[3] Thus, Plaintiff cannot be afforded any presumption with regard to the
number of hours he worked each day.

However, if the Court is still willing to allow Plaintiff to attempt to present evidence of his
alleged damages at trial (despite that such evidence would be wholly unreliable and speculative),
there are only 3 possible ways to make any determination about his work hours.

First, Plaintiff could offer testimony from the customers for whom he provided services about
the amount of time he spent performing those services in their homes and businesses. Notably,
however, Plaintiff did not depose, and has not identified a single customer who he seeks to have
testify as a witness at trial -- presumably, because he knows that no customer would be able to
corroborate his incredible contentions about the amount of time he worked.

Second, as Plaintiff repeatedly states, he could try to offer evidence from his own recollection
regarding his work hours. However, for the reasons set forth in detail above, Plaintiff should be
precluded from doing so as his deposition testimony makes clear that he has no idea how much

---

[3] Plaintiff was not alone in confirming a complete inability to prove damages in a case like this
when independent contractors fail to keep records of the time they worked. Every Plaintiff
Defendant deposed in the Byfield case admitted that they could not do so, and this is one of the
principle reasons why the Plaintiffs in that case decided to settle and not go to trial. See Joint
Memorandum of Points and Authorities in Support of Joint Motion of the Parties for Preliminary
Approval of the Proposed Consent Decree and of the Proposed Consent Order Providing for
Notice to the class, Opportunity to Object or Opt Out, And a Fairness Hearing, at p. 7 ("[I]t is
clear from the deposition testimony of the few putative class members who participated in
discovery that – even if liability could be established – no damages could be proven to have
been suffered because no admissible evidence exists about the number of hours worked.")

The Honorable Robert P. Patterson
May 24, 2013
Page 4



time he actually spent working on any given day. Certainly, he cannot now change this sworn testimony at trial.

Third, the Court can draw reasonable conclusions from the testimony of other individuals with personal knowledge as to how long it took them to perform carpet installation services similar to those of Plaintiff. It is for this reason that we have identified rebuttal witnesses who, unlike Plaintiff, do know how long it takes them to perform certain similar tasks, and could provide reliable testimony to that effect. Not surprisingly, such testimony will not support Plaintiff's outlandish claims and will confirm he did not work any overtime. [4]

Simply stated, Plaintiff will be unable to prove his damages with any degree of certainty or reasonableness given his utter failure to recollect or keep records of the amount of the hours he allegedly worked. What is worse is that Plaintiff, as an independent contractor, controlled every aspect of the manner in which his services were performed, including whether and to what extent his employees assisted him; yet, he did not keep a single record for himself or his employees with regard to how much time he spent performing services, or how many hours his employees worked in assisting him . Consequently, Plaintiff cannot now be permitted to testify at trial that on <u>any day</u> (regardless of the nature or amount of the work he performed that day), he worked 14 hours. In short, for the reasons set forth above, the theory of offering "recollection testimony" and the cases Plaintiff has cited are inapplicable.

Christopher A. Parlo

cc:     Karl J. Stoecker, Esq. *(Plaintiff's counsel)*
        Ira G. Rosenstein, Esq.

---

[4] Every effort to get Plaintiff to provide an estimate of hours, and a calculation of damages from those hours, based upon the jobs reflected in his invoices, has been refused by Plaintiffs. That does not stop other carpet installers from being able to credibly testify that, for example, a square room with an installation of 50 yards of carpet regularly takes only "X" hours.

# TAB A

WILLIAM  PIERCE

1              William Pierce

2    Allen Carpet, did they sell carpet or merely

3    install carpet?

4         A.    No.  All the outfits that I worked

5    for, they sell it.

6         Q.    So G. Fried, Allen Carpet, Quality

7    Carpet?

8         A.    They all sell carpet, and ABC.

9         Q.    At Quality Carpet how were you

10   paid?  And my question goes to what we've been

11   discussing, by the yard, by the hour, by the

12   week?

13        A.    By the yard, the same way.  They

14   hire you and they tell you if you want this job,

15   this is the pay scale for this job if you want

16   it, and that's the way it goes.

17        Q.    Did you get employee benefits at

18   Quality Carpet?

19        A.    I never got employee benefits since

20   I left the camera store, ma'am.

21        Q.    After Quality Carpet where did you

22   work?

23        A.    ABC.

24        Q.    Well we'll spend a lot of time on

25   that, so we'll leave that aside for the moment.

WILLIAM  PIERCE

1                 William Pierce

2    training once you had started at ABC, is that

3    correct?

4         A.     Training.  When I got to ABC ma'am

5    I had already worked in the carpet for maybe 25,

6    30 years.

7         Q.     When you went to ABC were you paid

8    more per yard than you had been paid at Quality?

9         A.     I thought I did.  I thought I did,

10   but I didn't.  The expenses, I had no expenses.

11   So if I got $3 a yard at Quality then that's a

12   different $3 a yard than Mr. Chapman going to

13   start me with 3.25, but when you add all the

14   expenses and all the money taken out I'm making

15   less money and I'm putting in longer hours.

16        Q.     Did you ever consider going back to

17   Quality?

18        A.     Yes.  I thought about going back

19   but I didn't want to be a part of the delivery.

20   See ABC delivered the carpet for you, that's

21   part of their procedure, so the carpet was on

22   the job.  Most outfits they don't deliver so you

23   got to load it up, carry it upstairs and I used

24   to do that, but as you get older you have less

25   energy and by that time I was way up in my 50s,

WILLIAM  PIERCE

```
 1              William Pierce
 2      A.      For ABC?
 3      Q.      For ABC.
 4      A.      No.  I was on jobs and the managers
 5 have come by the jobs.
 6      Q.      While you were installing carpet?
 7      A.      Yeah.
 8      Q.      Who were those managers?
 9      A.      I have no idea, ma'am.
10      Q.      Why did they come by?
11      A.      It was some complaint that the
12 customer got on the phone, it had nothing do
13 with me, so the manager or the salesman have to
14 come and see.  A major complaint was that's not
15 the color I ordered, that's not the color,
16 that's not what you promised me.
17              So when they ask me what color is
18 that I said I don't know ma'am.  You don't tell
19 the customer oh, yeah, that's grayish, she said
20 well I didn't order grayish, I ordered blue; and
21 who's in trouble, me, for running my mouth.  I
22 don't know nothing.
23      Q.      So managers would come when there
24 was trouble with the carpet?
25      A.      With the customer and the carpet.
```

WILLIAM   PIERCE

1                    William Pierce

2         Q.      With the customer and the carpet.

3    Not with the installer and the customer or the

4    installer and the carpet?

5                    MR. STOECKER:  Object to the form.

6         Q.      You can answer.

7         A.      No, I knew how to conduct myself in

8    people's homes, ma'am.  I was very respectable,

9    I respect all ladies, you know, so that's how I

10   am.  I have three daughters so I respect women,

11   so I knew how to conduct, I didn't make them

12   afraid.  See, you have to understand we have a

13   problem, you still deal with this, believe me.

14                    So if I come to your door and

15   here's a black man at your house and you home

16   alone, you're very skeptical of letting me in,

17   you're nervous.  I haven't said anything to you,

18   I haven't done anything to you; I'm very

19   respectful.

20                    In fact, I used to come to the door

21   singing in the morning, I like to sing when I

22   work.  But because of the complexion of my skin

23   you automatically have fear of me, automatic.

24   But don't feel bad, I feel the same way when I'm

25   walking the street at night, I fear my own.  If

Case 1:04-cv-01218-RPP-GWG   Document 35   Filed 05/28/13   Page 10 of 24

WILLIAM PIERCE

```
1                    William Pierce
2    get home at 11 at night and I've been nothing
3    but working, how many hours I put in that day, I
4    don't even know.  Do you have any idea?  You
5    good in math, you got a degree.
6         Q.     But I'm the question asker today.
7         A.     You said I could ask you questions.
8    I'm trying to break it down to be honest now,
9    I'm trying to be honest.
10        Q.     Fair enough.  That 15 hour period
11   that you just described, between 8:00 in the
12   morning and 11 at night, that included travel
13   between jobs?
14        A.     Oh, yeah.
15        Q.     Did it include your travel home?
16        A.     I get home.
17        Q.     Did you work every day?  Did you
18   work five days a week when you were working at
19   ABC?
20        A.     Most times I worked every day.
21        Q.     By which you mean five days?
22        A.     Yeah, five days.  Let me see, I was
23   working Saturdays for them?  I don't recall if
24   they ever asked me to come in and do a special
25   job for them on a Saturday, I don't recall that.
```

WILLIAM PIERCE

```
 1                    William Pierce
 2    from ABC that indicated they paid the payroll
 3    taxes?
 4         A.     To be honest I'm real stupid,
 5    because the only thing I was concerned about was
 6    the amount of the check.  Did they give me what
 7    I said I worked for this week.  The stub I gave
 8    to my wife, she took it.  To be honest with you
 9    I didn't look at it and I didn't care about it,
10    to be honest, I didn't care.
11         Q.     When you came to ABC from Quality
12    did you bring any tools with you, carpet laying
13    tools?
14         A.     Yeah, I had some personal tools.
15         Q.     And you bought those tools?
16         A.     I assume I did.  You know I don't
17    really know because my tools was old and I had
18    them a long time.  You get familiar with a
19    hammer and stuff.  I don't know when I started
20    with Allen Carpet if they gave us your set of
21    tools that you need to do the job, but I had
22    tools, but as tools wore out ABC would get you
23    tools.
24         Q.     And they would give them to you?
25         A.     No, they don't give you nothing.
```

WILLIAM  PIERCE

| | |
|---|---|
| 1 | William Pierce |
| 2 | They give you supplies to do their work. |
| 3 | Q.     But they didn't give you tools? |
| 4 | A.     Oh, they would get them for you, |
| 5 | they would take it out of your pay. |
| 6 | Q.     So if you needed a new pair of |
| 7 | scissors or a hammer or a staple gun, whatever |
| 8 | tools you use, ABC would buy them for you? |
| 9 | A.     It was cheaper if you just went to |
| 10 | the store yourself and got them. |
| 11 | Q.     Did you do that? |
| 12 | A.     Huh? |
| 13 | Q.     Did you do that? |
| 14 | A.     I replaced certain tools that way |
| 15 | because they charge you too much when you go |
| 16 | through the company.  Everybody gotta make a |
| 17 | profit.  I asked one of my bosses that question, |
| 18 | I said why we don't get no discount, he said |
| 19 | everything that goes through my office that my |
| 20 | girls have to write up, I gotta get paid for |
| 21 | that. |
| 22 | Q.     When you would buy tools because it |
| 23 | was less expensive did you pick them out? |
| 24 | A.     What do you mean did I pick them |
| 25 | out? |

WILLIAM  PIERCE

```
 1              William Pierce
 2       Q.     Was there a time when you had
 3  extended absences from illness, if you recall?
 4       A.     No.  My sicknesses didn't magnify
 5  until when I left ABC.  I don't think I was
 6  taking that much medication.  I'm a diabetic and
 7  I have high blood pressure, and I couldn't have
 8  been doing the kind of work I was doing if I had
 9  those ailments.
10       Q.     Did you submit an invoice like the
11  one in Pierce 3 for all the work that you did?
12              MR. STOECKER:  Object to the form.
13       A.     Basically if I did a job, one job,
14  two jobs, three jobs, I would write it out and
15  submit it to them and let them know that I did
16  that work.  They knew what my pay scale was so
17  they would pay me accordingly.
18       Q.     Did you ever do work for them, for
19  ABC, that you didn't submit to them for payment?
20       A.     That I did submit?
21       Q.     That you did not submit for
22  payment?
23       A.     You mean they paid me under the
24  table for that job?
25       Q.     I mean that you didn't ask them to
```

WILLIAM  PIERCE

```
 1              William Pierce
 2  be paid for?
 3       A.    You mean I did a favor for them?
 4       Q.    Yes.
 5       A.    No, ma'am.  You don't do as hard
 6  work as that for a favor.
 7       Q.    So if there's a week when you
 8  didn't submit a bill that meant you didn't work
 9  that week, is that correct?
10            MR. STOECKER:  Object to the form.
11       A.    I can answer?
12       Q.    Yes.
13       A.    If I didn't put a bill in I didn't
14  work.  Let me tell you something, excuse me if I
15  may be -- you say I gotta be honest with you.
16  There may be over a period of ten years I may
17  have taken a day, that I did the day, but I
18  didn't have much work that week and don't even
19  submit a bill and put it in on the next week, I
20  have done that.  In fact, you probably can look
21  at some dates and find out because you can tell
22  by the dates.  Like something happened right
23  here, the 13th to the 20th, that's more than a
24  week.
25       Q.    That's two Fridays as a matter of
```

WILLIAM PIERCE

```
 1                    William Pierce
 2   needed three people did they ever tell you no,
 3   you could only take two?
 4        A.      No, they didn't, no.  Because they
 5   wanted the job done and if I figured I needed an
 6   extra man in order to get the job done today so
 7   I will be able to do the work for tomorrow,
 8   because the job gotta be finished today, that's
 9   why the hours came in, it had to be finished
10   today no matter what.
11        Q.      With Mr. Drumgo, did he negotiate
12   with you every day you went out with respect to
13   how much you would pay him?
14        A.      Yeah, how much he wanted for what I
15   gotta do today, he would tell you hey, if I'm
16   going to be out like this here then I want X
17   amount of dollars and I gotta see if I can
18   afford to give him that out of the money that
19   I'm going to make.
20        Q.      Did you ever negotiate with him and
21   say that seems like a little too much Lloyd?
22        A.      You don't negotiate in the hood,
23   ma'am.  You don't negotiate in the hood.
24        Q.      So he would state his price and you
25   would take it or leave it?
```

WILLIAM PIERCE

1                    William Pierce

2   said it doesn't matter if you got a job, if you

3   use me over a certain period of time you gotta

4   put me down on your taxes.   That's the IRS

5   saying that.

6        Q.    I'm sorry, I don't think I

7   understand your answer.

8                    (Question read.)

9        Q.    So the IRS, can you elaborate on

10  what the IRS was paying to you?

11       A.     I don't know how it came up, but

12  the question was that I had to put someone down

13  that they worked for me, with me, they worked

14  with me, maybe I worked for them because they

15  gave me the price that they wanted to do

16  whatever they was doing.

17              So maybe I was working for them but

18  that was part of the money that I made for the

19  year.   Over a certain period of time that I used

20  that person the IRS said you gotta put them on

21  your income tax.

22       Q.    Was the IRS saying to you then that

23  that person, here Mr. Drumgo, would be your

24  employee?

25       A.     No, they didn't go through all

WILLIAM  PIERCE

1              William Pierce

2    that.  They just told me what my responsibility

3    would be towards the IRS, that's what they was

4    telling me.

5         Q.    What's your understanding of what

6    that responsibility was?

7         A.    That if I work with you, if we

8    share money over a certain period of time then I

9    have to show that on my income.

10        Q.    That you had paid that money to

11   Mr. Drumgo, is that what you had to show?

12        A.    Yeah, that he charged me this,

13   this, this and this 20 times this year or 30

14   times this year, after a certain amount you

15   gotta put it down.  Now if I only use you one

16   time and I gave you cash they don't count that,

17   I don't have to put that down.

18        Q.    I see.  Was it your understanding

19   that you had to report that money on a 1099

20   form?

21        A.    It was some kind of form.  It was

22   some kind of form, I don't know what it was.  I

23   don't know too much about that aspect of it.  I

24   know my daughters, they fixed it.  I don't know

25   nothing about that but they told me that they

WILLIAM PIERCE

```
 1                 William Pierce
 2   gotta put that down.  They must have checked it
 3   with the IRS or something, I don't know about
 4   that.  All I was concerned about is how much do
 5   I have to pay them, that's all I cared about.
 6        Q.     Did you pay Workers' Compensation
 7   for Mr. Drumgo?
 8        A.     No, I didn't pay Workers'
 9   Compensation for me I thought.  I thought I
10   wasn't paying it for nobody.
11        Q.     Did you provide disability
12   insurance for Mr. Drumgo?
13        A.     No.  I didn't provide nothing.
14   Nobody provided that for me.
15        Q.     Did you pay him in cash?
16        A.     Yes.
17        Q.     Did you ever give him one of those
18   tax forms that the IRS was talking about?
19             MR. STOECKER:  Object to the form.
20        A.     I don't know what it's called.  He
21   had to claim -- I told him, I said I put down so
22   you better keep track of the money because I'm
23   putting it down on my taxes.  He must have got
24   something because he told me that he had to go
25   down to the IRS, they called him.  So maybe from
```

WILLIAM   PIERCE

```
 1                   William Pierce
 2    my papers I submitted they called him to see
 3    where his was, so something like that, I don't
 4    know.
 5         Q.     But did you ever give him a form?
 6         A.     I'm not sure if my daughter gave
 7    him something.  Is it something called a C, a B
 8    or something, I don't know that, I don't know
 9    that stuff.
10         Q.     I'm going to ask you to check to
11    see if your daughter has a form or a copy of a
12    form?
13         A.     If my daughter has a copy of the
14    form, there's no way in the world my daughter
15    would have a copy.  It just happened to be
16    casually laying around, they are not in that
17    business.  Whatever they did for me they got
18    what they needed to do it while they were doing
19    their taxes or whatever to help me, to do this
20    for me, but they would have the necessary
21    papers.  They wouldn't have that stuff laying
22    around, they not into the tax business.
23         Q.     I made the request and you can
24    discuss that with Mr. Stoecker.  Do you have an
25    employer ID number for tax purposes?
```

WILLIAM PIERCE

```
1                    William Pierce
2    were just looking at, you see that it says P160
3    at the bottom, that's just an identification
4    number.
5               You don't recall having received
6    this letter, is that correct?
7         A.    I'm saying I must have got this
8    letter and when I got the letter I didn't know
9    nothing about what the problem was, and I still
10   don't know what the problem is.
11        Q.    In the third paragraph of that
12   letter, the second sentence.  That letter says
13   "Please submit a list of all the subcontractors
14   you hired."  Fair to say you did not submit a
15   list like that?
16        A.    No.  You said subcontractors that I
17   hired, is that what you saying?
18        Q.    That's what the letter says.
19        A.    I ain't hired no subcontractors, I
20   wasn't in business, I only had a job.
21        Q.    So did you submit a list?
22        A.    How could I submit a list?  How
23   could I submit a list?  I had guys working for
24   me off the street, this and that, they wasn't no
25   contractors, no subcontractors, these are just
```

WILLIAM   PIERCE

```
 1                    William Pierce
 2    people that were working.
 3          Q.     Let's have a look at the next page
 4    in Pierce 8.
 5          A.     What page is that?
 6          Q.     It says P161 at the bottom.
 7          A.     Yeah, $22,750.
 8          Q.     Right above that it says "The Board
 9    is in receipt of your letter and records."  Do
10    you recall what your letter and records were?
11          A.     I have no idea ma'am.  I guess you
12    could find out from them.  I probably told them
13    the same thing I'm telling you, I was only a
14    worker, I had a job, I worked for ABC Carpet.
15    That's what I did and how I got involved in all
16    this stuff I have no idea.
17          Q.     Do you believe it is incorrect when
18    they say that they received letters and records
19    from you?
20          A.     I may have sent them a letter
21    trying to ask them to explain to me what's going
22    on because I had no idea about this.  When I got
23    a letter telling me all this money and what they
24    was threatening to do, that's when I got in
25    contact with them and found out what the deal
```

Page 153

WILLIAM  PIERCE

1                    William Pierce

2    this piece of paper?

3         A.     I didn't make the changes though.

4    I seemed to benefit from the changes but I

5    didn't make them.

6         Q.     Fair enough.  Again, back to my

7    same question that I'm going to ask you about

8    all of these documents.  How many hours did you

9    work this week?

10        A.     Ma'am, I have no way of knowing how

11   many hours that I worked, okay.

12        Q.     Okay.

13        A.     You want me to do that surmising

14   stuff again, do you want me to go through that.

15        Q.     No, you've been very good about not

16   surmising.  So you can say I don't know and

17   that's fine.

18        A.     I do want to put something on the

19   record if you just want to know.  I never worked

20   a week that it wasn't over 40 hours.

21        Q.     Not once?

22        A.     Never.  I never worked less that my

23   total came to for the week, not a day, for the

24   week, less than 40 hours, that's unheard of.

25        Q.     Okay, let's talk about that for a

Case 1:04-cv-01218-RPP-GWG  Document 35  Filed 05/28/13  Page 23 of 24
MAY-24-2013 FRI 03:39 PM                    FAX NO.

Page 154

WILLIAM  PIERCE

```
 1                    William Pierce
 2    second.  Let's skip ahead for a few pages.  The
 3    third page from the back of Pierce 3.
 4          A.     What's the number?
 5          Q.     550.
 6          A.     Okay, I'm with you.
 7          Q.     Is it your testimony then,
 8    consistent with your last answer, that you
 9    worked 40 hours this week?
10          A.     This particular week here?
11          Q.     Yes.
12          A.     No.  I said I average over 40.  If
13    I didn't get no work, I couldn't work 40 hours
14    that week if I didn't get no work, and it seemed
15    like I only worked two days.
16          Q.     How much work would you have to get
17    to work over 40 hours?
18          A.     More than two days.
19          Q.     Okay.  More than three days?
20          A.     It depends on the job.
21          Q.     Speaking of three days a week let's
22    have a look at D354, the fifth page in Pierce 3
23    dated October 14, 2000 at the top?
24          A.     I see it.
25          Q.     Can you tell me how many hours you
```

WILLIAM PIERCE

```
 1                    William Pierce
 2               MR. STOECKER:  Let her ask the
 3   question.
 4        A.    She asked me.
 5        Q.    I did but your attorney didn't
 6   understand the question, but I appreciate that
 7   you did.  So for example, a job that you say
 8   started on the 9th wasn't necessarily finished
 9   on the 9th?
10        A.    It depends on the job.
11        Q.    Let's turn two pages on to D0392,
12   the date is August 11, 2001.  Can you tell me
13   how many hours you worked this week?
14               MR. STOECKER:  Objection.
15        A.    Would you like me to throw a figure
16   out at you how many hours I worked?
17        Q.    No, I'm actually asking you --
18        A.    You can't possibly expect me to
19   tell you on this particular date how many hours
20   I worked at that date.  Do you know anybody who
21   can do that besides Superman?
22        Q.    You've answered my question.
23        A.    You want me to lie?
24        Q.    No, sir.  Did you work, if you can
25   tell, more than four days this week?
```